IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

ROBERT C. WILSON                                                    PLAINTIFF

v.                                    CIVIL NO. 16-2230

NANCY A. BERRYHILL, [1] Acting Commissioner,
Social Security Administration                                      DEFENDANT

## **MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Robert C. Wilson, brings this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of a decision of the Commissioner of the Social Security Administration

(Commissioner) denying his claims for a period of disability and disability insurance benefits

(DIB) and supplemental security income (SSI) under the provisions of Titles II and XVI of the

Social Security Act (Act). In this judicial review, the Court must determine whether there is

substantial evidence in the administrative record to support the Commissioner's decision. See

42 U.S.C. § 405(g).

## I.      **Procedural Background:**

Plaintiff protectively filed his current applications for DIB and SSI on February 12,

2014, alleging an inability to work since January 1, 2006, due to the following conditions:

narrowing of the spine, bone fragments/spurs, carpal tunnel syndrome, nerve pain in legs,

numbness and pain in hands, numbness in left foot, difficulty walking, pneumonia, dizziness,

and chronic neck and back pain. (Doc. 11, pp. 82, 91, 103). For DIB purposes, Plaintiff

[1] Nancy A. Berryhill, has been appointed to serve as acting Commissioner of Social Security, and is substituted as Defendant, pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

1

maintained insured status through December 31, 2010. (Doc. 11, pp. 82, 103, 220). An administrative hearing was held on December 23, 2014, at which Plaintiff appeared with counsel and testified. (Doc. 11, pp. 35-78).

In a written opinion dated August 18, 2015, the ALJ found that the Plaintiff had the following severe impairments: disorder of the back, carpal tunnel syndrome, coronary artery disease (CAD), asthma, neuropathy, and obesity. (Doc. 11, p. 19). For DIB purposes, Plaintiff maintained insured status through December 31, 2010. (Doc. 11, p. 19). However, after reviewing the evidence in its entirety, the ALJ determined that the Plaintiff's impairments did not meet or equal the level of severity of any listed impairments described in Appendix 1 of the Regulations (20 CFR, Subpart P, Appendix 1). (Doc. 11, pp. 19-20). The ALJ found Plaintiff retained the residual functional capacity (RFC) to:

> perform sedentary work as defined in 20 CFR 404.15679a) and 416.967(a) except he is limited to occasional overhead reaching bilaterally; frequent bilateral handling and fingering; and he must avoid concentrated exposure to fumes, odors, dust, gases, and poorly ventilated areas.

(Doc. 11, p. 20). With the help of a vocational expert (VE), the ALJ determined that while Plaintiff was unable to perform his past relevant work, he could perform the requirements of a representative of occupations, such as small products assembler, document preparer, and escort vehicle driver. (Doc. 11, pp. 26-27). Ultimately, the ALJ concluded that the Plaintiff had not been under a disability within the meaning of the Social Security Act from January 1, 2007, the alleged onset date, through August 8, 2015, the date of the ALJ's decision. (Doc. 11, p. 27).

Subsequently, on August 27, 2015, Plaintiff requested a review of the hearing decision by the Appeals Council. (Doc. 11, pp. 12-13). The Appeals Council denied his request on

August 6, 2016. (Doc. 11, pp. 5-8). Plaintiff filed a Petition for Judicial Review of the matter on September 19, 2016. (Doc. 1). Both parties have submitted briefs, and this case is before the undersigned for report and recommendation. (Docs. 10, 13).

The Court has reviewed the transcript in its entirety. The complete set of facts and arguments are presented in the parties' briefs and are repeated here only to the extent necessary.

## II.    Evidence Submitted:

At the hearing before the ALJ on December 23, 2014, Plaintiff testified that he graduated from high school. (Doc. 11, p. 39). Plaintiff's past relevant work consisted of a pipeline construction laborer and a construction equipment mechanic helper. (Doc. 11, pp. 66-67).

On March 31, 2010, during the relevant time period for Plaintiff's DIB claim, Plaintiff visited River Valley Care Services for complaints of left arm pain and a cough. (Doc. 11, p. 355). Clinic notes reveal that Plaintiff was left-handed, that he used that arm often while working as a mechanic, that he was a smokeless tobacco user, and that he weighed 200 pounds. (Doc. 11, p. 355). At that visit, Plaintiff was assessed with acute sinusitis, hypertension, and lateral epicondylitis. (Doc. 11, p. 355). Plaintiff visited River Valley Care Services again on April 14, 2010. (Doc. 11, p. 353). Advanced Practice Nurse Laura Henson noted Plaintiff's weight of 201 pounds and assessed him with allergic rhinitis and pharyngitis. (Doc. 11, pp. 353-354).

Plaintiff returned to River Valley Care Services on July 1, 2010, for a follow up for his blood pressure and complaints of not sleeping well, fatigue, and anxiety. (Doc. 11, p. 352). Nurse Henson noted Plaintiff's weight of 204 pounds and assessed him with feeling tired,

hypertension, nonorganic sleep disorder, primary insomnia and anxiety disorder. (Doc. 11, p. 353). She recommended Plaintiff participate in a sleep lab, but Plaintiff declined due to lack of insurance. (Doc. 11, p. 353). In November of 2010, Plaintiff saw Nurse Hanson again with complaints of left shoulder pain. Clinic notes indicate that Plaintiff was working full time, was a user of smokeless tobacco, was currently consuming five cups of coffee per day, and weighed 201 pounds. (Doc. 11, pp. 351-352). Plaintiff had a normal examination and was assessed with benign essential hypertension, primary insomnia, and left shoulder pain and numbness. (Doc. 11, p. 352).

After the relevant time period for DIB ended, Plaintiff continued to see Nurse Henson at River Valley Care Services. On January 31, 2011, Plaintiff reported to Nurse Henson that he was under some stress while dealing with a stalker. (Doc. 11, p. 350). Her notes reveal that Plaintiff was working full time, that he was making attempts to quit using smokeless tobacco, that he was consuming five cups of coffee per day, and that he weighed 201 pounds. (Doc. 11, pp. 350-351). Plaintiff was assessed with hypertension, anxiety disorder, and numbness. (Doc. 11, p. 351). At Plaintiff's April of 2011 visit with Nurse Henson, Plaintiff reported that after he and his father had an argument, he drank moonshine and used two cans of tobacco, causing him to experience chest pain. (Doc. 11, p. 349). Nurse Henson's notes reveal that Plaintiff was working full time, was a tobacco user, consumed five cups of coffee per day, and weighed 203 pounds. (Doc. 11, pp. 349-350). She assessed him with hypertension, primary insomnia, and anxiety disorder. (Doc. 11, p. 350).

On February 23, 2012, Plaintiff saw Nurse Henson for a follow up and complaints of a sore throat. (Doc. 11, p. 348). Her notes repeated that Plaintiff was working full time, was a user of smokeless tobacco, consumed five cups of coffee per day, and weighed 216 pounds.

(Doc. 11, p. 348).  Plaintiff's physical examination was normal, and he was assessed with hypertension, pharyngitis, and male orgasmic disorder.  (Doc. 11, p. 348).

In July of 2012, Plaintiff saw both Dr. Janet Guyer and Nurse Henson at River Valley Primary Care Services for complaints of shoulder pain, left arm pain, left foot pain, knots on his lower leg, heartburn, and right testicle pain. (Doc. 11, pp. 346-347).  At the two visits, Plaintiff's weight was documented at 228 and 233 pounds. (Doc. 11, pp. 346-347). Clinic notes show that he was still using smokeless tobacco and that he was working full time. (Doc. 11, pp. 346-347). That month, Plaintiff was assessed with left shoulder joint pain, left foot and leg pain, and testicle disorder.  (Doc. 11, pp. 346-347).

In February of 2013, Plaintiff was treated again by Nurse Henson for complaints of high blood pressure. (Doc. 11, p. 344).  Nurse Henson noted that Plaintiff was not compliant with his medication, that he was a user of smokeless tobacco, that he consumed five cups of coffee per day, and that he weighed 240 pounds. (Doc. 11, p. 345).  Plaintiff was assessed with hypertension, pain in his thigh area, and anxiety disorder NOS, and he was advised to lose weight, increase his water intake, consume less sugary beverages, and decrease his sodium intake. (Doc. 11, p. 345).  In June of 2013, Plaintiff saw Nurse Henson for medication refills only.  (Doc. 11, p. 344).

In July of 2013, Plaintiff saw Nurse Henson with complaints of muscle pain in legs, numbness in hands and feet, and sores under his tongue.  (Doc. 11, p. 343).  Plaintiff requested testing for diabetes and a new MRI of his cervical spine.  (Doc. 11, pp. 343-344).  Clinic notes reveal that there was a correlation between the sore on Plaintiff's tongue and his use of smokeless tobacco. (Doc. 11, p. 343).  Plaintiff's weight was recorded at 241 pounds, and he

was assessed with benign essential hypertension, primary insomnia, hyperlipidemia, bilateral thigh pain, and numbness. (Doc. 11, p. 344). Plaintiff underwent lab work on July 23, 2013. (Doc. 11, p. 343).

On August 2, 2013, Plaintiff had a MRI on his cervical spine for neck pain that was radiating to his shoulders. (Doc. 11, p. 308). The MRI showed the following: fusion, either congenital or postsurgical fusion, at C5-6 level with cervical spondylosis with large, bulky anterior osteophyte formation; multilevel, mostly mild, central stenosis noted throughout the cervical spine with probably severe central stenosis at C3-4 level related to broad based protrusion with short pedicles with some mild mass effect on the anterior cord; and multilevel foraminal narrowing. (Doc. 11, p. 308).

On August 29, 2013, Plaintiff visited Mercy Clinic Neurosurgery in Fort Smith where he saw Dr. Joseph Queeney for numbness in his hands and pain in his neck. (Doc. 11, p. 329). Dr. Queeney noted that Plaintiff used smokeless tobacco, weighed 243 pounds, and was five feet, five inches tall. (Doc. 11, pp. 330-331). Dr. Queeney also noted that x-rays showed spurring at C4-5 and fusion at C5-6, and based on a recent MRI, there was no evidence of any nerve or compression or significant spinal stenosis. (Doc. 11, p. 331). Dr. Queeney did not recommend surgery, and Plaintiff said he would consider a myelogram of his cervical spine and an EMG and NCV of both upper extremities. (Doc. 11, p. 332). Another x-ray of Plaintiff's cervical spine showed degenerative disc disease of the cervical spine and a previous fusion at C5-6. (Doc. 11, p. 525).

On September 3, 2013, Plaintiff saw Nurse Henson for left shoulder and joint pain. (Doc. 11, p. 342). Also in September, Plaintiff saw Nurse Henson for complaints of left foot

numbness and pain in his shoulders and neck. (Doc. 11, p. 341). She noted that Dr. Queeney had diagnosed Plaintiff with carpel tunnel syndrome in Plaintiff's right hand only. (Doc. 11, p. 341). She assessed Plaintiff with benign essential hypertension, cervicalgia, shoulder joint pain, numbness, hyperlipidemia, and carpal tunnel syndrome in right hand. (Doc. 11, p. 342).

On September 29, 2013, Plaintiff was seen at the Summit Medical Center Emergency Room for fever and a cough, where he was diagnosed with pneumonia and an upper respiratory infection. (Doc. 11, pp. 313-314). Medical records from that day also indicate that Plaintiff was a smoker of one half of a pack of cigarettes per day. (Doc. 11, p. 315).

On October 3, 2013, Plaintiff followed up with Nurse Henson after his visit to the emergency room and diagnosis of pneumonia. (Doc. 11, p. 339). Nurse Henson's clinic notes reveal that Plaintiff was still using smokeless tobacco and that he weighed 235 pounds. (Doc. 11, pp. 340-341). She also instructed Plaintiff to remain off work for another two days. (Doc. 11, p. 341).

On October 25, 2013, Plaintiff had a follow up with Nurse Henson for his pneumonia. (Doc. 11, p. 339). Nurse Henson noted that Plaintiff continued to wheeze and cough up clear sputum and that he had complaints of tenderness in the left side of his chest. (Doc. 11, p. 339). His weight was recorded at 238 pounds and he was assessed with chronic bronchitis. (Doc. 11, p. 340). Post follow up, Plaintiff had an x-ray of his chest, which showed the following: clearing of right-sided infiltrate/nodular density when compared to last exam; no acute infiltrates or mass lesions seen at this time; and degenerative changes of the thoracic spine present. (Doc. 11, p. 312).

On November 20, 2013, Plaintiff returned to Nurse Henson with continued complaints of a productive cough. (Doc. 11, p. 338). Nurse Henson noted that Plaintiff had returned twice for continued treatment with no improvement and assessed him with chronic bronchitis and cough. (Doc. 11, p. 338). Plaintiff was assessed with chronic bronchitis again on January 16, 2014, when he saw Nurse Henson for continued complaints of pneumonia, as well as lightheadedness, double vision, leg pain, left foot numbness, and pain in his right testicle. (Doc. 11, p. 337). Plaintiff returned to Nurse Henson the next week requesting to be checked for diabetes. (Doc. 11, p. 336). Nurse Henson noted that Plaintiff's weight was 244 pounds, and she recommended a pulmonary evaluation. (Doc. 11, pp. 336-337).

During the relevant time period for Plaintiff's SSI claim, on March 13th and 14th of 2014, Dr. Dan Donahue, Ph.D., performed a Psychiatric Review Technique, finding that Plaintiff had only mild restrictions of activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace. (Doc. 11, pp. 86, 95). He concluded that there was no evidence that Plaintiff had a severe mental impairment and noted that this assessment applied on or before "Plaintiff's DLI and currently." (Doc. 11, pp. 87, 96).

Also on March 13th and 14th of 2014, Dr. Clarence Ballard completed a physical RFC Assessment, where he determined that Plaintiff had the following restrictions: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk six hours in an eight hour day; sit six hours in an eight hour day; and limiting reaching, right and left overhead. (Doc. 11, pp. 88, 97). Dr. Ballard opined that Plaintiff had a medium RFC and noted that "insufficient evidence in file to rate physical impairment at/or before date last insured, 12/31/10." (Doc. 11, pp. 88, 98).

On March 14, 2014, during the relevant time period for Plaintiff's SSI claim, Plaintiff saw Nurse Henson for lung issues and a productive cough. (Doc. 11, p. 414). At that time, Plaintiff's weight was 245 pounds. (Doc. 11, p. 415). He was assessed with a cough and pneumonia, and Nurse Henson ordered a chest x-ray. (Doc. 11, pp. 408, 415). The x-ray results showed no active disease radiographically. (Doc. 11, p. 409).

On April 6, 2014, Plaintiff was seen at the Fort Smith Lung Center by Dr. Mahar Dahdel. (Doc. 11, p. 384). A preliminary description of the lung function testing was follows: an FEV1/FVC Ratio of 108% predicted is normal; spirometry is within normal limits; lung volumes are within normal limits; diffusing capacity appears normal; and after bronchodilator, mid-expiratory flow increased by 86 L/S. (Doc. 11, p. 384). Two days later, on April 8, 2014, Plaintiff had an office visit with Dr. Dahdel due to continued complaints of a cough. (Doc. 11, p. 386). Dr. Dahdel noted Plaintiff's use of smokeless tobacco, his weight of 247 pounds, and assessed Plaintiff with asthma, cough, insomnia, and obstructive sleep apnea. (Doc. 11, pp. 386, 388-389). A chest x-ray showed the following: cardio silhouette was within normal limits of size and lungs were clear of acute infiltrates. (Doc. 11, p. 385).

A nerve conduction study performed on April 16, 2014, proved abnormal results and findings electrophysiologically consistent with bilateral carpal tunnel syndrome, moderate on the right and moderate to severe on the left. (Doc. 11, pp. 542, 544-548).

During a visit with Nurse Henson on April 21, 2014, she referred Plaintiff to Dr. Queeney for back pain and left and right foot numbness. (Doc. 11, p. 413).

On April 24, 2014, Plaintiff underwent a myelogram on his cervical spine, which showed the following: cervical myelography with what appeared to be postsurgical changes;

better detail should be provided by CT post myelography and subsequent imaging; and patient did appear to have multilevel lumbar spinal stenosis, which was noted as the contrast was injected, especially at 2-3, 3-4, and 4-5 levels. (Doc. 11, p. 524). A CT scan of the cervical spine post myelography provided the following results: post fusion changes C5 to 6; small midline budge at 2-3, broader slightly more prominent bulge C3-4 and some spur and disc bulge C4-5 above the level of the fusion; some broad-based posterior spurring along C5 and C6; and mild thyroid prominence. (Doc. 11, p. 522).

A lumbar spine MRI performed on April 28, 2014, yielded the following results: multilevel degenerative disc disease with hypertrophic changes of the facets and probably short pedicles causing multilevel central stenosis which may be severe at L3-4 and L4-5 levels and at least moderate at L2-3 level, and foraminal narrowing L4-5 level. (Doc. 11, pp. 420-421).

On May 12, 2014, Plaintiff saw Dr. Queeney for a follow up on his neck pain. Plaintiff still had complaints of numbness in his hands and intermittent bilateral arm pain. (Doc. 11, p. 401). Records reveal that Plaintiff used smokeless tobacco, that he weighed 247 pounds, and that he had quit "drug use" one year ago. (Doc. 11, pp. 402-403). Dr. Queeney's notes reflect that Plaintiff was not interested in a posterior cervical neck fusion with lateral mass screws, nor was Plaintiff interested in addressing the carpal tunnel syndrome surgically at that time. (Doc. 11, p. 403).

On May 19, 2014, Dr. Abesie Kelly, Ph.D. performed a Psychiatric Review Technique, finding that Plaintiff had only mild restrictions of activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace. She concluded that there was no evidence that Plaintiff had a severe mental impairment and noted that "[t]his applied

on/before Plaintiff's DLI and currently." (Doc. 11, pp. 109, 120). Dr. Kelly also noted on reconsideration, that Plaintiff's physical examinations stated euthymic mood and no mental diagnosis. (Doc. 11, p. 120). On that same date, Dr. Bill Payne completed a physical RFC assessment, where he determined that Plaintiff had the following limitations: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk 6 hours in an 8-hour day; sit 6 hours in an 8-hour day; and limited reaching, right and left overhead. (Doc. 11, pp. 121-122). Dr. Payne concluded that Plaintiff had a light RFC and noted "DIB – Insufficient evidence in file to rate physical impairment at/or before date last insured, 12/31/10." (Doc. 11, p. 123).

On May 22, 2014, Plaintiff saw Dr. Queeney for complaints of back pain, radiating down his left leg to his foot and pain in his right leg down to his foot. Dr. Queeney's records indicate that Plaintiff was not working at the time, that he was a user of smokeless tobacco, that he had quit drug use one year ago, and that he weighed 247 pounds. (Doc. 11, p. 517). Dr. Queeney also noted that x-rays showed arthritis at the lumber region; that a MRI done previously did not show any discrete nerve compression, which did not explain the numbness in his legs; and that he would not recommend surgery for the back pain. (Doc. 11, p. 518). Dr. Queeney's impression was neuropathy, and he opined that Plaintiff should proceed with the EMG/MCV of both lower extremities to determine if peripheral neuropathy was present. (Doc. 11, pp. 518-519).

On May 27, 2014, Nurse Henson diagnosed Plaintiff with pharyngitis, cough, idiopathic neuropathy, and lumbago lumbar, when he presented with complaints of a sore throat. (Doc. 11, pp. 477-478).

11

On June 6, 2014, Plaintiff saw Dr. William Knubley, a neurologist at Mercy Clinic in Fort Smith for conduction studies. (Doc. 11, p. 541). Studies yielded normal results except for showing some changes that could be early polyneuropathy. (Doc. 11, p. 541). Plaintiff revisited Dr. Knubley on July 30, 2014, with complaints of back pain and numbness and pain in lower extremities. (Doc. 11, p. 534). Dr. Knubley noted Plaintiff's previous testing, including a lumbar spine MRI, a post myelogram CT of the neck, and an EMG, all which failed to produce results that would account for Plaintiff's symptoms. (Doc. 11, p. 534). Dr. Knubley noted Plaintiff's smokeless tobacco use, his weight of 253 pounds, and the fact that he quit drug use one year ago. (Doc. 11, p. 536). Dr. Knubley opined the following: that Plaintiff had a history of symptoms that were atypical of neuropathy based on his examination; that he may have some small fiber neuropathy symptoms in his feet, but this would not account for normal to brisk reflexes in his legs; that he may have some pre-existing myelopathy changes from cervical spine surgery, but currently unable to confirm etiology of symptoms related to progressive neuropathy or lumbar stenosis; that he may have a combo of factors including small fiber neuropathy from possibly prediabetes as well as cervical myelopathy from nonstructural causes; and that he may also have some contusion of his neck from intermittent previous falls. (Doc. 11, pp. 538-539). Dr. Knubley noted that Plaintiff did not have much chronic low back pain at that point in time, but that Plaintiff's blood pressure was currently elevated. (Doc. 11, pp. 538-539). Dr. Knubley recommended an evaluation for physical therapy, a TENS unit, appropriate neuropathy lab studies, a MRI of the cervical spine, possibly a MRI of the thoracic spine, and a prescription of Lyrica. (Doc. 11, p. 539).

On August 4, 2014, Plaintiff saw Nurse Henson, requesting a referral to a pain management specialist and to a urologist. (Doc. 11, p. 476). Nurse Henson reported Plaintiff's

weight of 255 pounds and assessed him with nonorganic sleep disorder, numbness, testicle disorder, atopic dermatitis, chest pain for discomfort, idiopathic peripheral neuropathy, and shortness of breath. (Doc. 11, pp. 476-477).

A MRI of Plaintiff's cervical spine performed on August 7, 2014, showed post fusion C5-6, similar to that on April 24, 2014 CT myelogram; small right paracentral disc protrusion at C3-4; small central disc bulge, tiny protrusions at C2-3; and C4-5 small central protrusion; and no significant disc bulge at C6-7 and C7-T1. (Doc. 11, p. 530).

On August 8, 2014, Plaintiff underwent an EMG with nerve conduction at Mercy Neurology by Dr. Knubley. (Doc. 11, p. 519). The EMG yielded normal results except for nonspecific changes. (Doc. 11, p. 520).

On September 18, 2014, Plaintiff saw Dr. Ronald Guyer at Sparks Urology Group for testis pain. (Doc. 11, p. 435). Dr. Guyer noted Plaintiff's smokeless tobacco use, his obesity, and his weight of 259 pounds. (Doc. 11, p. 436). Dr. Guyer assessed Plaintiff with orchialgia and noted that he suspected Plaintiff's pain was referred pain from his back and/or neuropathy. (Doc. 11, p. 437).

On October 3, 2014, Plaintiff saw Dr. Dario Espina at the Arkansas Heart Center. (Doc. 11, p. 439). Dr. Espina noted Plaintiff's use of smokeless tobacco and his weight of 266 pounds. (Doc. 11, pp. 493-494). Dr. Espina also assessed Plaintiff with chest pain unspecified; angina pectoris with an abnormal MPI; obstructed sleep apnea; metabolic syndrome dysmetabolic syndrome; hyperlipidemia; insomnia due to medical condition; morbid obesity; hypertension; left foot, hip and leg numbness and pain which limits walking with activities of daily living; spinal stenosis; degenerative disc disease; coronary atherosclerosis; and vitamin

D deficiency. (Doc. 11, p. 494). Plaintiff returned to Dr. Espina for a follow up on October 15, 2014. (Doc. 11, pp. 438-439).

On November 5, 2014, Plaintiff saw Dr. Ronald Knobloch at Sparks Health System for persistent testicular pain. (Doc. 11, p. 442). Dr. Knobloch noted Plaintiff's weight of 260 pounds, and he noted that he "suspect[ed] pain is referred from back/neuropathies. Not much else to add urologically." (Doc. 11, pp. 463-464).

On November 7, 2014, Plaintiff underwent an arterial catheterization performed by Dr. Espina. (Doc. 11, p. 445). Upon discharge, Plaintiff was diagnosed with angina pectoris and coronary atherosclerosis of native coronary artery. (Doc. 11, p. 445). Dr. Espina noted that the plan for Plaintiff included the following: undergoing weight loss surgery; treatment for obstructive sleep apnea; decreasing LDL cholesterol to below 70; taking Ranexa and Nitroglycerin; taking aspirin; taking beta-blockers and/or calcium channel blockers for angina and hypertension; and returning for intervention if symptoms occurred. (Doc. 11, pp. 449-450).

On November 11, 2014, Plaintiff presented at Arkansas Pain - Relief Experts for complaints of pain in his legs, arms, neck and back. (Doc. 11, p. 454). Plaintiff was prescribed Lamictal to treat neuropathic pain as he weaned off Lyrica. (Doc. 11, p. 458). Clinic notes reflect Plaintiff's obesity and weight of 246 pounds. (Doc. 11, p. 454).

On November 19, 2014, Plaintiff saw Dr. Knubley for a follow up for numbness in his lower extremities and hands and extremity pain. Dr. Knubley noted the following: Plaintiff's history of long-standing neuropathic pain in the lower extremities, which was atypical for neuropathy, although it could be small fiber neuropathy from diabetes or prediabetes;

postoperative myelopathy changes in the neck and/or degenerative disc disease changes in the back; and vitamin D deficiency. (Doc. 11, p. 528). He recommended taking vitamin D treatment, and returning in 6 months. (Doc. 11, p. 528).

On December 3, 2014, Plaintiff returned to Dr. Espina for a follow-up visit. (Doc. 11, pp. 493-494). Plaintiff's physical examination was normal, except that a notation was made that "[f]ull ROM not tested," and Plaintiff's Cardio IQ testing, performed on November 12, 2014, was noted. (Doc. 11, pp. 486-492, 493-494). Dr. Espina assessed Plaintiff with the following conditions: chest pain unspecified, angina pectoris, obstructive sleep apnea, metabolic syndrome, hyperlipidemia, insomnia due to medical condition, morbid obesity, hypertension essential, chronic pain, left foot/left leg/left hip numbness and pain, spinal stenosis, degenerative disc disease, coronary atherosclerosis (shown by cardiac catheterization, and vitamin D deficiency. (Doc. 11, p. 494).

On December 9, 2014, Plaintiff returned to the pain relief center with complaints of pain in his neck, back, legs and feet. (Doc. 11, p. 495). His weight was recorded at 246 pounds. (Doc. 11, p. 495). Clinic notes reveal that Plaintiff requested interventional pain management. Plaintiff's high tolerance to pain medication resulted in doctors prescribing extended- release morphine. (Doc. 11, p. 499). Plaintiff was to return in one month. (Doc. 11, p. 500). On December 16, 2014, Plaintiff underwent grip testing, which showed moderate to severe deficiency bilaterally. (Doc. 11, p. 505).

## III.    Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F.3d 576, 583 (8th

Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. § 423(d)(1)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet

or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his RFC. See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982), abrogated on other grounds by Higgins v. Apfel, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

**IV.    Discussion:**

Plaintiff makes the following arguments on appeal: 1) the ALJ erred in failing to find that Plaintiff's mental impairments were presumptively disabling under the Listings; 2) the ALJ failed to properly assess Plaintiff's RFC;[2] and 3) the ALJ erred in his step five analysis.[3]

**A.    Insured Status and Relevant Time Period:**

In order to have insured status under the Act, an individual is required to have twenty quarters of coverage in each forty-quarter period ending with the first quarter of disability. 42 U.S.C. § 416(i)(3)(B). Plaintiff last met this requirement on December 31, 2010. Regarding Plaintiff's application for DIB, the overreaching issue in this case is the question of whether Plaintiff was disabled during the relevant time period of January 1, 2007, his alleged onset date of disability, through December 31, 2010, his date last insured.

In order for Plaintiff to qualify for DIB he must prove that, on or before the expiration of his insured status he was unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which is expected to last for at least twelve

---

[2] The Court notes that Plaintiff made several different arguments under the allegation related to the RFC. The Court will address them separately.
[3] The Court has reordered Plaintiff's arguments to correspond with the five-step analysis utilized by the Commissioner.

months or result in death. <u>Basinger v. Heckler</u>, 725 F.2d 1166, 1168 (8th Cir. 1984). Records and medical opinions from outside the insured period can only be used in "helping to elucidate a medical condition during the time for which benefits might be rewarded." <u>Cox v. Barnhart</u>, 471 F.3d 902, 907 (8th Cir. 2006) (holding that the parties must focus their attention on claimant's condition at the time he last met insured status requirements).

With respect to Plaintiff's SSI application, benefits are not payable prior to the date of the application, regardless of how far back disability may, in fact, be alleged or found to extend. <u>See</u> 20 C.F.R. § 416.335. Therefore, regarding Plaintiff's application for SSI, the relevant period is from February 12, 2014, the date Plaintiff protectively applied for SSI benefits, through August 18, 2015, the date of the ALJ's decision.

**B.  Listings:**

Plaintiff argues that the ALJ erred by failing to determine that Plaintiff's impairments medically equal Listing 1.04(A) for disorders of the spine, [4] and Listing 4.04(C) for cardiac

---

[4] Listing 1.04 states as follows:

1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. § Pt. 404, Subpt. P, App. 1.

impairments,[5] as listed in the Listing of Impairments pursuant to 20 CFR Part 404, Subpart P, Appendix 1.

The burden of proof is on the Plaintiff to establish that his impairment meets or equals a listing. See Sullivan v. Zebley, 493 U.S. 521, 530-31, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). To meet a listing, an impairment must meet all of the listing's specified criteria. Id. at 530, 110 S.Ct. 885 ("An impairment that manifests only some of these criteria, no matter how severely, does not qualify."); Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004). "Medical equivalence must be based on medical findings." 20 C.F.R. § 416.926(b) (2003); Sullivan, 493 U.S. at 531 ("a claimant ... must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment"). In this case, the ALJ explicitly found that there were no medical listings that precisely met or medically equaled the criteria described in any of the impairments contained in the Listing of Impairments. (Doc. 11, p. 20).

The Court notes that a MRI of Plaintiff's cervical spine on August 2, 2013, which was outside the relevant time periods, yielded the following results: fusion, either congenital or

---

[5] Listing 4.04(C) states as follows:

4.04(C) Ischemic heart disease, with symptoms due to myocardial ischemia, as described in 4.00E3-4.00E7, while on a regimen of prescribed treatment (see 4.00B3 if there is no regimen of prescribed treatment), with one of the following: Coronary artery disease, demonstrated by angiography (obtained independent of Social Security disability evaluation) or other appropriate medically acceptable imaging, and in the absence of a timely exercise tolerance test or a timely normal drug-induced stress test, an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that performance of exercise tolerance testing would present a significant risk to the individual, with both 1 and 2:

    1.   Angiographic evidence showing:
        a.   50 percent or more narrowing of a nonbypassed left main coronary artery; or
        b.   70 percent or more narrowing of another nonbypassed coronary artery; or
        c.   50 percent or more narrowing involving a long (greater than 1 cm) segment of a nonbypassed coronary artery; or
        d.   50 percent or more narrowing of at least two nonbypassed coronary arteries;
        e.   70 percent or more narrowing of a bypass graft vessel; and

    2.   Resulting in very serious limitations in the ability to independently initiate, sustain, or complete activities of daily living.

20 C.F.R. § Pt. 404, Subpt. P, App. 1.

postsurgical fusion, at C5-6 level with cervical spondylosis with large, bulky anterior osteophyte formation; multilevel, mostly mild, central stenosis noted throughout cervical spine with probably severe central stenosis at C3-4 level likely related to broad based protrusion with short pedicles with some mild mass effect on the anterior cord; and multilevel foraminal narrowing. (Doc. 11, p. 308). Dr. Queeney's clinic notes on August 29, 2013, state that based on the MRI, there was no evidence of any nerve or compression or significant spinal stenosis. (Doc. 11, p. 332). He also noted that Plaintiff had no muscle weakness in his upper extremities. (Doc. 11, p. 332). As noted above, nerve root compression and muscle weakness or atrophy associated with muscle weakness are part of the criteria required to meet the Listing.

An April 24, 2014, myelographic CT scan of Plaintiff's cervical spine showed post fusion changes and large spurs at C4-5 and C6-7. (Doc. 11, p. 522). A MRI of Plaintiff's lumbar spine performed on April 28, 2014 showed the following: multilevel degenerative disc disease with hypertrophic changes of the facets and probably short pedicles causing multilevel central stenosis which may be severe at L3-4 and L4-5 levels and at least moderate at L2-3 level; and foraminal narrowing L4-5 level. (Doc. 11, p. 421). Dr. Queeney's follow up clinic notes from April 24, 2014, and May 12, 2014, did not indicate any muscle weakness or atrophy and noted both sets of imaging results. (Doc. 11, pp. 403, 524).

An additional MRI of the lumbar spine conducted on May 22, 2014, revealed degenerative disc disease, indicated some lateral spurring at L2-3, L3-4, L4-5, and L5-S1, and noted a bit of retrolisthesis of L5-S1. (Doc. 11, p. 521). Office notes from Dr. Queeney on that same day state that imaging did not show any discrete nerve compression. (Doc. 11, p. 518). Further, Dr. Knubley's clinic notes of July 30, 2014, stated that the MRI findings were not felt to be sufficient enough to account for Plaintiff's symptoms and notes that the post myelogram

CT scan of Plaintiff's neck earlier in the year did not demonstrate any severe spinal stenosis. (Doc. 11, p. 534). An August 7, 2014, MRI of Plaintiff's cervical spine with contrast showed the following: post fusion C5-6 similar to that seen on recent CT myelogram of 4/24/14; small right paracentral disc protrusion at C3-4; small central disc bulge, tiny protrusions at C2-3, C4-5 and small central protrusion; and no significant disc bulge at C6-7, C7-T1. (Doc. 11, p. 530).

As it relates to Plaintiff's cardiovascular impairment, Plaintiff underwent an arterial heart catheterization on November 7, 2014, which showed the following: 50 to 75 percent stenosis in one digital branch of the left anterior descending vessel and 85 percent stenosis in a small vessel of the intermediate ramus. (Doc. 11, p. 449). The testing also showed that Plaintiff's left main artery was free of obstruction, the remainder of his left anterior descending vessels were free of obstruction, the large vessel of the circumflex artery was free of obstruction, and the right coronary artery had minimal irregularities. (Doc. 11, p. 449).

Further, in his February 23, 2014 Function Report, Plaintiff reported that his daily routine consisted of getting out of bed; brushing his teeth; taking his medication; watching television; often sitting on the porch; preparing a sandwich for lunch; taking his medication again; preparing his dinner; taking his medication; and going to bed. (Doc. 11, p. 250). He also stated that he went to the post office and bank regularly; he would occasionally eat out for a meal; he could go out alone; and he spent time with others. (Doc. 11, p. 254). As noted above, part of the criteria required to meet the Listing is that Plaintiff had very severe limitations in the ability to independently initiate, sustain, or complete activities of daily living.

The Court finds, based upon the record as a whole, as well as the well-stated reasons outlined in the Defendant's brief, that Plaintiff's argument is without merit, and there was sufficient evidence for the ALJ to make an informed decision. After reviewing the entire

evidence of record, the Court finds there is sufficient evidence to support the ALJ's determination that Plaintiff's impairments do not medically equal Listings 1.04(A) and 4.04(C).

### C. Full and Fair Developed of the Record:

Plaintiff argues that the ALJ erred in failing to fully develop the record by failing to order a psychological evaluation as well as a comprehensive medical evaluation. The ALJ has a duty to fully and fairly develop the record. See Frankl v. Shalala, 47 F.3d 935, 938 (8th Cir. 1995). The ALJ's duty to fully and fairly develop the record is independent of Plaintiff's burden to press his case. Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010). The ALJ, however, is not required to function as Plaintiff's substitute counsel, but only to develop a reasonably complete record. "Reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial." Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995). "While an ALJ does have a duty to develop the record, this duty is not never-ending and an ALJ is not required to disprove every possible impairment." McCoy v. Astrue, 648 F.3d 605, 612 (8th Cir. 2011).

In this case, the record consists of physical RFC Assessments and psychiatric review techniques completed by non-examining medical consultants and Plaintiff's medical records, which included clinic notes from treating physicians and imaging results. After reviewing the entire record, the Court finds the record before the ALJ contained the evidence required to make a full and informed decision regarding Plaintiff's capabilities during the relevant time period. Accordingly, the undersigned finds the ALJ fully and fairly developed the record.

### D. Severe Impairments:

Plaintiff argues that the ALJ erred in failing to find that Plaintiff's mental impairment was medically determinable and met severity. At Step Two of the sequential analysis, the ALJ is required to determine whether a claimant's impairments are severe. See 20 C.F.R. §§ 404.1520(c), 416.920(c). While "severity is not an onerous requirement for the claimant to meet…it is also not a toothless standard." Wright v. Colvin, 789 F.3d 847, 855 (8th Cir. 2015) (citations omitted). To be severe, an impairment only needs to have more than a minimal impact on a claimant's ability to perform work-related activities. See Social Security Ruling 96-3p. The claimant has the burden of proof of showing he suffers from a medically-severe impairment at Step Two. See Mittlestedt v. Apfel, 204 F.3d 847, 852 (8th Cir. 2000).

On his disability application, Plaintiff listed the following conditions as reasons for his inability to work: narrowing of the spine, bone fragments/spurs, carpal tunnel syndrome, nerve pain in legs, numbness and pain in hands, numbness in left foot, difficulty walking, pneumonia, dizziness, chronic neck and back pain. (Doc. 11, pp. 82, 91, 103). While Plaintiff testified that he was experiencing some symptoms of anxiety and/or depression at the hearing and was treated on a couple of occasions for the condition, Plaintiff failed to allege a mental condition (anxiety and/or depression) in his disability application. See Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001) (The fact that she did not allege depression in her application for disability benefits is significant, even if the evidence of depression was later developed).

Furthermore, while the ALJ did not find all of Plaintiff's alleged impairments to be severe impairments, the ALJ specifically discussed the alleged impairments in the decision, and clearly stated that he considered all of Plaintiff's impairments, including the impairments that were found to be non-severe. See Swartz v. Barnhart, 188 F. App'x 361, 368 (6th Cir.

2006) (where ALJ finds at least one "severe" impairment and proceeds to assess claimant's RFC based on all alleged impairments, any error in failing to identify particular impairment as "severe" at step two is harmless); Elmore v. Astrue, 2012 WL 1085487 *12 (E.D. Mo. March 5, 2012); see also 20 C.F.R. § 404.1545(a)(2), 416.945(a)(2) (in assessing RFC, ALJ must consider "all of [a claimant's] medically determinable impairments ..., including ... impairments that are not 'severe' "); §§ 404.1523(c), 416.923(c) (ALJ must "consider the combined effect of all [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity"). Based on a review of the record, the Court finds the ALJ did not err in setting forth Plaintiff's severe impairments.

### E.    Subjective Complaints and Symptom Analysis:

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id. As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).

After reviewing the administrative record, it is clear that the ALJ properly considered and evaluated Plaintiff's subjective complaints, including the Polaski factors. As noted above, the record reflects that Plaintiff completed a Function Report on February 23, 2014, wherein

he reported he had trouble getting around due his pain level and that he had difficulty with most of the things he used to do before he became ill. (Doc. 11, p. 251). He stated that his daily routine consisted of getting out of bed; brushing his teeth; taking his medication; watching television; often sitting on the porch; preparing a sandwich for lunch; taking his medication again; preparing his dinner; taking his medication; and going to bed. (Doc. 11, p. 250). He noted that it was more difficult for him to cook for himself, so he often fixed sandwiches for his meals or his girlfriend would cook for him. (Doc. 11, p. 252). He also stated that he went to the post office and bank regularly; he would occasionally eat out for a meal; he could go out alone; and he spent time with others. (Doc. 11, p. 254). He reported that his girlfriend helped him on occasion with household chores and she would also shop for him. (Doc. 11, pp. 252-253). He stated that he could ride in a car, pay bills, count change, handle a savings account and use a checkbook or money order. (Doc. 11, p. 253).

In making a credibility determination, the ALJ pointed out that while Plaintiff alleged disability beginning January 1, 2007, the earliest medical record in the file was dated March of 2010. (Doc. 11, p. 22). The ALJ also pointed out that during a visit to Nurse Henson on February 11, 2013, Plaintiff reported that he had stopped all of his medication "months ago" and had since been experiencing symptoms of fatigue, leg pain, head pressure, and elevated blood pressure. (Doc. 11, pp. 22, 344-345). In May of 2014, Dr. Queeney informed Plaintiff that a posterior cervical fusion could be done to remedy some of his neck pain and that he could surgically address the carpal tunnel syndrome; however, Plaintiff declined both surgeries. (Doc. 11, pp. 24, 403). Brown v. Barnhart, 390 F.3d 535, 540-541 (8th Cir. 2004)(citations omitted)("Failure to follow a prescribed course of remedial treatment without

good reason is grounds for denying an application for benefits."). 20 C.F.R. §§ 404.1530(b), 416.930(b).

Moreover, Plaintiff's primary care nurse consistently noted his weight in her medical records, and she also counseled him to lose weight, increase his water intake, consume less sugary beverages, and decrease his sodium consumption. (Doc. 11, p. 345). Further, Dr. Espina diagnosed him with morbid obesity and recommended weight-loss surgery. (Doc. 11, pp. 449, 494). In addition, on numerous occasions, Plaintiff's doctors noted that he was a daily user of smokeless tobacco. The ALJ noted that Plaintiff also reported to Nurse Henson at an April of 2011 visit, that Plaintiff had argued with his father, after which he indulged in drinking "Moonshine" and chewing two cans of tobacco, resulting in chest pain so severe that he almost visited the emergency room. (Doc. 11, p. 340).

With respect to Plaintiff's symptom of numbness in his legs, Dr. Knubley's July of 2014 clinic records indicate that Plaintiff's recent lumbar spine MRI findings were not sufficient enough to account for Plaintiff's symptoms. (Doc. 11, p. 534). Moreover, he noted that the Post myelogram CT of Plaintiff's neck did not demonstrate any severe spinal stenosis, and the EMG was fairly normal, although it showed some changes that could be early polyneuropathy. (Doc. 11, p. 534). In May of 2014, Dr. Queeney's office notes indicate that a recent MRI did not show any discrete nerve compression, which did not explain Plaintiff's symptom of numbness in his legs. (Doc. 11, p. 518). In August of 2013, Dr. Queeney's notes also indicated that Plaintiff's MRI showed no evidence of any nerve or compression or significant spinal stenosis. (Doc. 11, p. 332).

While Plaintiff testified regarding some anxiety and depression that he was experiencing, the record failed to establish that Plaintiff sought on-going and consistent

treatment from a mental health provider.  See Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001) (holding that lack of evidence of ongoing counseling or psychiatric treatment for depression weighs against Plaintiff's claim of disability).  Plaintiff stated that he would become anxious around other people and would choose not to be around other people very often.  (Doc. 11, p. 64).  He also testified that he was taking medication for the anxiety and depression he was experiencing.  (Doc. 11, pp. 64-65).  However, medical records indicate that any anxiety and/or depression was situational in nature; thus, Plaintiff was not consistently prescribed medication or treated for depression or anxiety during the relevant time period.

While it is clear that Plaintiff suffers with some degree of limitation, he has not established that he was unable to engage in any gainful activity.  Accordingly, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible.

F.      The ALJ's RFC Determination and Medical Opinions:

Plaintiff alleges that the ALJ failed to properly assess Plaintiff's RFC when he determined that in light of Plaintiff's carpal tunnel syndrome, he was capable of frequent handling and fingering.

RFC is the most a person can do despite that person's limitations.  See 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). It is assessed using all relevant evidence in the record. Id. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations. See Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. See 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a

"claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. See Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id.

In deciding whether a claimant is disabled, the ALJ considers medical opinions along with "the rest of the relevant evidence" in the record. 20 C.F.R. §§ 404.1527(b), 416.927(b). "It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole." Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007), citing Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001) (internal citations omitted).

In his RFC determination, the ALJ considered Plaintiff's subjective complaints, the medical records, and the evaluations of the non-examining medical examiners. In determining that Plaintiff was able to perform sedentary work with limitations, including frequent handling and fingering, the ALJ specifically discussed the relevant medical records, and the medical opinions of treating, examining and non-examining medical professionals, and set forth the reasons for the weight given to the opinions. Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) ("It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians") (citations omitted); Prosch v. Apfel, 201 F.3d 1010, 1012 (the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole).

As it relates to Plaintiff's carpal tunnel syndrome, medical records showed that Dr. Queeney diagnosed Plaintiff with carpal tunnel syndrome on May 12, 2014, following the results of a nerve conduction study, which showed that Plaintiff had moderate carpal tunnel syndrome on the right hand and moderate to severe on the left. (Doc. 11, pp. 403, 544-548). On May 22, 2014, Plaintiff returned to Dr. Queeney with complaints of low back pain and leg pain, with no mention of upper extremity or hand pain. (Doc. 11, p. 515). Further, at a July 30, 2014 visit to Dr. Knubley for complaints of bilateral lower extremity numbness, extremity pain, and back pain, Dr. Knubley noted that Plaintiff's EMG was fairly normal, although it showed some changes that could be early polyneuropathy. (Doc. 11, pp. 534, 537). Plaintiff saw Nurse Henson on August 4, 2014, requesting a referral to pain management. (Doc. 11, p. 476). As a result, he visited Arkansas Pain – Relief Experts on November 11, 2014, and December 9, 2014, for complaints of pain in his neck, back, legs, arms and feet. (Doc. 11, pp. 454, 495). Plaintiff returned to Dr. Knubley on November 19, 2014 for numbness in his lower extremities and hands, and extremity pain. (Doc. 11, p. 527). Plaintiff also underwent grip testing in December of 2014, which showed moderate to severe deficiency bilaterally. (Doc. 11, p. 505).

The Court notes that overall, the medical records reveal that Plaintiff's complaints of carpal tunnel syndrome were somewhat inconsistent. For instance, after his diagnosis of carpal tunnel syndrome on May 14, 2014, he returned to Dr. Queeney on May 22, 2014, just eight days later, complaining of only low back pain, leg pain, and no complaints of upper extremity pain. (Doc. 11, p. 515). Moreover, Plaintiff had numerous doctor appointments during the remainder of 2014, where Plaintiff did not complain of pain or numbness in his hands. (Doc. 11, pp. 436, 442, 445-452, 476-478, 493, 534, 541).

The Court also notes that medical records do not indicate that Plaintiff underwent any specific treatment for the carpal tunnel syndrome. Specifically, on May 12, 2014, when Dr. Queeney diagnosed Plaintiff with carpal tunnel syndrome, Plaintiff declined to have the carpal tunnel syndrome addressed surgically at that time. (Doc. 11, p. 403). See Novotny v. Chater, 72 F.3d 669, 671 (8th Cir. 1995) (per curiam) (failure to seek treatment inconsistent with allegations of pain). Furthermore, Plaintiff's treating physicians did not place any work restrictions on Plaintiff as a result of the carpal tunnel syndrome. See Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999) (lack of physician-imposed restrictions militates against a finding of total disability).

The Court also notes that on a July 30, 2014, visit to Dr. Knubley, for complaints of only bilateral lower extremity numbness, extremity pain, and back pain, Plaintiff's physical examination revealed full range of motion in his upper and lower extremities. (Doc. 11, pp. 534, 537). Further, at both visits to Arkansas Pain - Relief Experts, which occurred in November of 2014, and December of 2014, Plaintiff complained of symptoms associated with carpal tunnel syndrome; however, physical examinations reveal full range of motion, full resistance, and 5/5 strength in left and right upper extremities. (Doc. 11, pp. 456-457, 497).

Furthermore, in his determination of Plaintiff's RFC, the ALJ considered the opinion of the non-examining medical consultant, Dr. Clarence Ballard, who on March 13th and 14th of 2014, reviewed the medical record and found that Plaintiff had unlimited handling and fingering and was capable of medium work. (Doc. 11, pp. 88, 97-98). Moreover, on May 19, 2014, upon reconsideration, non-examining medical consultant, Dr. Bill Payne, also found that Plaintiff had unlimited handling and fingering, and determined that Plaintiff was capable of light work. (Doc. 11, pp. 111-112, 122-123). The Court notes that the nerve conduction study

showing carpal tunnel syndrome had been performed at the time of Dr. Payne's evaluation of Plaintiff's medical record. The ALJ gave these opinions substantial weight; nevertheless, the ALJ also gave weight to Plaintiff's subjective complaints of pain and numbness in his hands and his nerve conduction study findings in determining that Plaintiff's carpal tunnel syndrome was a severe impairment and in limiting him to sedentary work with occasional overhead reaching bilaterally and frequent, rather than unlimited, bilateral handling and fingering. (Doc. 11, p. 24).

In addition, the ALJ further considered the opinions of Drs. Dan Donahue, Ph.D. and Abesie Kelly, Ph.D., who both completed Psychiatric Review Technique forms on Plaintiff, finding that he had only mild limitations on restrictions of activities of daily living and no severe mental impairment. (Doc. 11, pp. 86-87, 109-120). Dr. Kelly also noted specifically that upon reconsideration, there was a new diagnosis of carpal tunnel syndrome, and that new medical records stated euthymic mood and no mental diagnosis. (Doc. 11, pp. 115, 120).

The ALJ also took Plaintiff's obesity into account when determining that Plaintiff could perform sedentary work with limitations. Heino v. Astrue, 578 F.3d 873, 881-882 (8th Cir. 2009) (when an ALJ references the claimant's obesity during the claim evaluation process, such review may be sufficient to avoid reversal).

Based on the record as a whole, the Court finds substantial evidence to support the ALJ's RFC determination of sedentary work with limitations, including frequent bilateral handling and fingering.

### G. Hypothetical Question to the Vocational Expert:

After thoroughly reviewing the hearing transcript along with the entire evidence of record, the Court finds that the hypothetical the ALJ posed to the vocational expert fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005). Accordingly, the Court finds that the vocational expert's opinion constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude him from performing work as a small products assembler, a document preparer, and an escort vehicle driver. Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996) (testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

## V. Conclusion:

Based on the foregoing, the Court recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice. **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 25th day of May, 2017.


/s/ Erin L. Wiedemann
HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE